In the Matter of Disciplinary Proceedings Against
Jeffrey T. Roethe, Attorney at Law:

Office of Lawyer Regulation,
Complainant,

v.

Jeffrey T. Roethe,
Respondent.

Supreme Court

*No. 2008AP2366–D.—Decided March 24, 2010.*

2010 WI 19

(Also reported in 780 N.W.2d 139.)

611

612

¶ 1. PER CURIAM. We review the report and recommendation of the referee, the Honorable Timothy L. Vocke, that Attorney Jeffrey T. Roethe receive a public reprimand and bear the full costs of this proceeding. Because no appeal has been filed, we review the referee's report and recommendation pursuant to SCR 22.17(2).[1] We approve and adopt the referee's findings of fact and conclusions of law. We agree that Attorney

---

[1] SCR 22.17(2) provides:

> If no appeal is filed timely, the supreme court shall review the referee's report; adopt, reject or modify the referee's findings and conclusions or remand the matter to the referee for additional findings; and determine and impose appropriate discipline. The court, on its own motion, may order the parties to file briefs in the matter.

Roethe's professional misconduct warrants a public reprimand. We also find it appropriate to require Attorney Roethe to pay the full costs of this disciplinary proceeding, which are $24,630.53 as of December 16, 2009.

¶ 2. Attorney Roethe was admitted to practice law in Wisconsin in 1969. He practices in Edgerton. In 2000 he received a public reprimand for violating conflict of interest rules when he represented a city, a developer, and a farmer in related real estate transactions without obtaining appropriate conflict waivers, and he also made misrepresentations to the Board of Attorneys Professional Responsibility, the predecessor to the Office of Lawyer Regulation (OLR).

¶ 3. On September 24, 2008, the OLR filed a complaint alleging five counts of misconduct arising out of Attorney Roethe's handling of two informal probate matters. The first probate matter involved the estate of G.W., who died on October 28, 1999. G.W.'s will appointed her niece, A.W., and her sister, M.S., as co-personal representatives. G.W.'s will named five beneficiaries, including the two co-personal representatives. G.W.'s will gave her sister-in-law an undivided one-half interest in a home that G.W. and M.S. owned as tenants-in-common. The will also made special bequests of personal property and provided that the remainder of the estate be divided equally among the five heirs.

¶ 4. On November 4 and 8, 1999, A.W. and G.W.'s sister-in-law met with Attorney Scott McCarthy, one of Attorney Roethe's partners in the law firm then known as Roethe, Krohn, Pope, McCarthy & Hass, LLP. M.S. was present at the November 8, 1999, meeting. No fee agreement was signed on either of those dates. On November 10, 1999, Barb Beyer, the firm's probate paralegal assistant, asked A.W. and M.S. to meet at the

firm's Edgerton office to sign the initial probate documents. On November 11, 1999, G.W.'s will and an application for informal probate were filed with the Rock County probate court and Attorney McCarthy entered his appearance in the matter. Domiciliary letters were issued to the co-personal representatives on November 22, 1999.

¶ 5. On November 23, 1999, at Ms. Beyer's request, A.W. and M.S. again met at the firm's Edgerton office. Attorney Roethe met with the two women and asked them to sign a document entitled, "Legal Services Agreement." The document referred to A.W. and M.S. as "Client" and Roethe, Krohn, Pope, McCarthy & Haas, LLP, as "Attorney." The agreement provided:

1. Services: CLIENT retains and employs ATTORNEY to provide legal services in his behalf concerning the probate of the following estate, to-wit [G.W.].

2. Fees: CLIENT agrees to pay ATTORNEY on the following basis (check A or B):

XX (A) FIXED FEE. A total fee not to exceed ~~four (4%)~~ three (3%)*** percent of the gross estate not including costs and disbursements to handle the completion of the estate proceedings through to conclusion.

____(B) HOURLY CHARGE. A fee of $____ per hour for all the time spent by ATTORNEY, and a fee of $____ per hour for PARALEGAL time, on the CLIENT'S matter in completing the estate proceedings to conclusion plus costs and disbursements.

***Unless contested issues increase the fees to not exceed four (4%) [percent].

¶ 6. The agreement did not contain an hourly fee. The fixed fee option was selected by inserting "XX" before the document was presented to the co-personal

representatives. The co-personal representatives and Attorney Roethe signed the Legal Services Agreement on November 23, 1999. According to Attorney Roethe, the Legal Services Agreement was his standard written probate fee agreement and he made the change from 4 percent to 3 percent with the understanding that the fee would become 4 percent if there were contested issues.

¶ 7. On November 23, 1999, Attorney Roethe asked the co-personal representatives to sign an undated personal representative's deed for the purpose of conveying G.W.'s undivided one-half interest in the house to G.W.'s sister-in-law, pursuant to the special bequest in G.W.'s will. The co-personal representatives signed the deed. The day and month on the deed were left blank. The deed stated it was drafted by Attorney McCarthy, and his name was typed under the line for authentication of the grantors' signatures, but the signatures were not authenticated or notarized.

¶ 8. A November 24, 1999, memorandum from Ms. Beyer to Attorney McCarthy stated the personal representative's deed had been signed and would be dated December 31, 1999. As of late November 1999 a large volume of personal property was still in the house and needed to be sorted through and either distributed or sold.

¶ 9. On December 8, 1999, Attorney Roethe sent a letter to M.S. clarifying her responsibility for one-half of the expenses associated with the house because she owned an undivided one-half interest in it. Ms. Beyer wrote a December 23, 1999, memorandum to Attorneys Roethe and McCarthy summarizing a telephone call she had received from A.W. The memo referred to a household sale and said that after the sale A.W. was planning to have the house professionally cleaned and treated for

mice infestation, and that once the house was cleaned and readied for sale it could be transferred to G.W.'s sister-in-law.

¶ 10. Attorney Roethe sent a letter dated January 17, 2000, addressed to all five heirs saying that a family meeting was scheduled for January 22 to discuss and resolve any problems. M.S. and one of the heirs were the only people to attend the meeting. Attorney Roethe sent a letter dated January 24, 2000, to A.W. expressing his regret that she was unable to attend the meeting. The letter stated that M.S. agreed the house could be put up for sale as soon as possible and that a sale of the personal property could be scheduled. The letter also said that M.S. had serious health problems and that her doctor had recommended she not continue as a co-personal representative. Attorney Roethe said he advised M.S. that instead of appointing someone else, they would work to wrap up the estate as quickly as possible. The letter went on to say that all heirs agreed the house could be immediately conveyed to G.W.'s sister-in-law, and that if repairs needed to be made to the property, those expenses needed to be paid out of the sale proceeds and not paid by the estate.

¶ 11. On January 25, 2000, A.W. and G.W.'s sister-in-law sent Attorney Roethe a letter saying the sister-in-law would not accept transfer of G.W.'s undivided one-half interest in the home until the estate sale was completed and the premises professionally cleaned. The letter also stated the sister-in-law would not accept responsibility for any utilities, property taxes, or expenses incurred until the sale and professional cleaning had been completed. The letter was signed by the sister-in-law and A.W., as co-personal representative.

¶ 12. On February 1, 2000, G.W.'s sister-in-law and A.W. sent Attorney McCarthy a letter notifying him

617

that no one in the law firm was to handle the sale of the house and that the sister-in-law and A.W. would take care of any necessary house sale arrangements. According to various memoranda from Ms. Beyer to Attorney Roethe, Ms. Beyer had been contacted by one of the heirs and by the proposed estate sale agent, and both had indicated their concern that A.W. had not signed the contract for the estate sale, despite attempts to get her to do so.

¶ 13. Attorney Roethe directed Ms. Beyer to "white out" Attorney McCarthy's name and insert Attorney Roethe's name as the person who had drafted the personal representative's deed that had been signed, but not dated, by the co-personal representatives on November 23, 1999. Attorney McCarthy's name, which had been typed under the line for authentication of the grantors' signatures, was also "whited out," and Attorney Roethe's name was typed under the line instead. Attorney Roethe also had the year the deed was drafted changed from 1999 to 2000 and he inserted February 11 as the date. Attorney Roethe then authenticated the co-personal representatives' signatures on February 11, 2000. Attorney Roethe said it was his firm's policy to list the name of the attorney responsible for a file on deeds, and he said that in his opinion, changing the name of the attorney and the date violated no part of the code of ethics and did not materially change the document or its effect.

¶ 14. The personal representative's deed containing Attorney Roethe's changes was recorded on February 14, 2000. Attorney Roethe said the decision to record the deed on that date was a joint decision of the heirs, Attorney McCarthy, and himself.

¶ 15. Attorney McCarthy sent A.W. and G.W.'s sister-in-law a letter dated February 11, 2000, which

said it was his understanding that they wanted to handle the house sale themselves. He advised that the law firm was recording the personal representative's deed transferring G.W.'s one-half interest in the house from the estate to G.W.'s sister-in-law. The letter also advised that the sister-in-law was empowered to proceed with the sale of the house with M.S. Attorney Roethe said the letter was drafted for Attorney McCarthy's signature because the February 1, 2000, letter from A.W. and G.W.'s sister-in-law had been addressed to Attorney McCarthy. Attorney Roethe said he reviewed the letter with Ms. Beyer and approved it.

¶ 16. On February 21, 2000, Attorney McCarthy sent G.W.'s sister-in-law the recorded personal representative's deed and said, "The estate no longer retains any interest in the house, and all expenses (utilities, repairs and taxes) should be paid for equally by you and [M.S.]."

¶ 17. On March 6, 2000, Ms. Beyer wrote a memorandum to Attorneys Roethe and McCarthy which said the person who had been planning to hold the estate sale would not in fact be holding the sale since she had been unable to obtain a signed contract from A.W. The memo also said that one of the heirs wanted to know what the options were since it was not possible to move forward without A.W.'s cooperation. The heir wondered if another co-personal representative could be appointed to serve with M.S. A handwritten note on the bottom of the memorandum stated, "Yes. Appoint new PR."

¶ 18. On March 6, 2000, Attorney Roethe sent A.W. a letter saying that the other heirs were upset that there was still no date scheduled for a sale of the

personal property, and that A.W.'s lack of communication was causing unnecessary delays in the estate. The letter went on to say:

> We are also now at the point in the estate where we need to obtain your financial accounting as personal representative. . . .
>
> It is imperative that you communicate with our office regarding the household sale and the final accounting we need to prepare for the estate. If I do not hear from you by March 15, 2000, the other heirs have instructed me to prepare the necessary documents to have you removed as co-personal representa-tive. . . .

¶ 19. Attorney Roethe's time records for G.W.'s estate show that a petition for M.S. to sign seeking the removal of A.W. as co-personal representative was drafted on March 14, 2000. An affidavit for M.S.'s and two heirs' signatures was drafted and reviewed by Attorney Roethe on the same date. M.S. signed the petition and affidavit on March 17, 2000. Attorney Roethe sent a letter dated March 15, 2000, to M.S. and the two heirs enclosing "the paperwork necessary to begin the process of removing [A.W.] as co-personal representative of the estate." The letter said the two heirs should each fax back their signed "Page 3" of the affidavit. The letter did not contain a notation that a copy was being sent to A.W. or G.W.'s sister-in-law.

¶ 20. According to firm time records, on March 15, 2000, Ms. Beyer had a telephone conversation with one of the heirs, revised the documents to remove A.W. as co-personal representative, and faxed copies to the heir. A copy of the last page of the affidavit, containing the two heirs' signatures, was faxed back to the law firm on March 16, 2000. Ms. Beyer notarized the two heirs' signatures on their affidavit. The jurat for the affidavit

stated, "Subscribed and sworn to before me this 16 day of March, 2000" and was signed "Barbara F. Beyer." Attorney Roethe admitted the two heirs lived out of state and did not personally appear before Ms. Beyer on March 16, 2000.

¶ 21. The petition to remove A.W. as co-personal representative, with its accompanying affidavit, was filed with the court on March 24, 2000. An order was issued that same day for the petition to be heard on April 26, 2000. The hearing was later adjourned to May 31, 2000. After several attempts to personally serve A.W. with notice of the hearing, the notice was served on G.W.'s sister-in-law on April 8, 2000. Notice of the hearing was also published in the *Milton Courier.*

¶ 22. On April 18, 2000, Attorney Guy Fish faxed a letter to Attorneys Roethe and McCarthy saying he had been retained by A.W. and asking whether Attorney Roethe's firm represented M.S. with respect to the petition. By letter dated April 19, 2000, Attorney Roethe told Attorney Fish that his firm represented G.W.'s estate and not M.S. as an individual. The letter said the majority of G.W.'s heirs were "clamoring to find out why this estate is not proceeding." He said he brought the petition because he could not probate the estate without A.W.'s cooperation. Attorney Roethe said he intended "to testify at the hearing as an officer of the Court about the delays caused by [A.W.'s] behavior. . . . "

¶ 23. On May 1, 2000, A.W. advised Attorney Roethe that she would resign as personal representative. Attorney Roethe sent A.W. a letter the following day enclosing a resignation form for A.W. to sign.

¶ 24. On May 3, 2000, G.W.'s sister-in-law collapsed and was rushed to a hospital. She lapsed into a coma and died on May 6, 2000.

¶ 25. A.W. signed the document saying she was resigning as co-personal representative on May 11, 2000. One of G.W.'s heirs, R.W., was appointed as successor co-personal representative on May 22, 2000.

¶ 26. The final account for G.W.'s estate listed attorney fees of $6,205.96. This amount was 4 percent of the inventoried value of the estate. The final account did not indicate that a percentage was used to calculate the amount of attorney fees. Attorney Roethe kept time records through August 3, 2000, on which date the billable time for the estate was $6,386.25. The final account was submitted and the estate was closed on February 1, 2001. The time spent to finalize the estate after August 3, 2000, was not billed because it exceeded the 4 percent fixed rate. Attorney Roethe's time records indicated that between March 3 and April 30, 2000, he spent 4.1 hours on matters that appeared to be directly related to the effort to remove A.W. as co-personal representative and Ms. Beyer spent approximately 9 hours on that task. Using their respective billing rates, this amounted to approximately $1,300 of billable time.

¶ 27. As noted, G.W.'s sister-in-law died on May 6, 2000. The sister-in-law's most recent will was dated September 18, 1998, and named A.W. and R.W. as beneficiaries and asked that they be appointed to serve as co-personal representatives. A.W. had the will in her possession. A copy of a 1987 will was also in existence. R.W. said he believed that A.W. had G.W.'s sister-in-law's most recent will. R.W. said he did not want A.W. to act as personal representative because of the trouble they had with her in G.W.'s estate.

¶ 28. On May 17, 2000, Attorney Carol Hatch faxed a copy of G.W.'s sister-in-law's 1987 will to R.W. The 1987 will appointed R.W. and A.W. as co-executors. On May 19, 2000, in response to a request from Ms.

Beyer, Attorney Fish faxed a copy of a more recent, but unsigned and undated, will to Ms. Beyer.

¶ 29. According to Attorney Roethe's time records, on May 22, 2000, a file was opened and the initial probate documents were prepared for G.W.'s sister-in-law's estate. By letter dated the same day, Attorney Roethe mailed the documents to R.W. instructing him to sign them so that the copy of the 1987 will could be filed with the court. On May 24, 2000, Ms. Beyer wrote Attorney Roethe a memo saying that R.W. had called to say A.W. told him she had a new will. The memo said R.W. told Ms. Beyer he would like to wait and see if A.W. filed the will. Ms. Beyer said she asked that R.W. still sign and return the documents that had been sent to him. In a May 29, 2000, letter to Attorney Roethe, R.W. said, "I have executed and hereby return the initial documents to be used to file with a copy of my mother's 1987 will. You should place whatever date is necessary on them."

¶ 30. In a June 5, 2000, letter to the register in probate, Attorney Roethe said because the original could not be located, he was enclosing a copy of G.W.'s sister-in-law's September 4, 1987, will. He also enclosed an application for informal administration, notice to creditors, and proof of heirship. Those documents were filed on June 6, 2000. The application, signed by R.W., said that R.W. had made diligent inquiry and was unaware of any subsequent revocation of the 1987 will. Attorney Roethe's letter to the court said, "You will note that the (sic.) [R.W.] is requesting that he be appointed as sole personal representative of the estate as he believes his sister [A.W.] is not suitable to serve."

¶ 31. On June 6, 2000, A.W. filed the 1998 will with the probate court.

¶ 32. The application for informal administration filed by Attorney Roethe on June 6, 2000, was signed by R.W. Ms. Beyer notarized R.W.'s signature on the application, and the jurat stated, "Subscribed and sworn to before me on 06–05–00" and was signed "Barbara F. Beyer." The proof of heirship was also signed by R.W. Ms. Beyer notarized R.W.'s signature on that document, with the same jurat as appeared on the application. R.W. was not in Wisconsin on June 5, 2000. His signature was already on the documents he returned to Attorney Roethe with his May 29, 2000, letter.

¶ 33. R.W. faxed G.W.'s sister-in-law's 1998 will to Attorney Roethe on June 6, 2000, saying he had received the document from A.W. that same day in an envelope postmarked June 2, 2000. On June 8, 2000, Attorney Roethe sent A.W. copies of the documents that had been filed on June 6, 2000, including a copy of the 1987 will, which he said R.W. had believed to be the last signed will. Attorney Roethe also enclosed a copy of the order giving notice of claims. He said he had just received a copy of the 1998 will from R.W. and he advised A.W. to file the original will as soon as possible. The letter also discussed the offer to purchase the house in which G.W.'s sister-in-law had owned an undivided one-half interest.

¶ 34. A.W., through counsel, filed a second petition for administration on June 13, 2000. The matter was set for hearing on July 7, 2000. A.W.'s attorney suggested the appointment of an independent personal representative, and this was agreed to by stipulation. The stipulation and order, filed on July 7, 2000, appointed a bank as the sole personal representative, admitted the 1998 will to probate, and stated that the June 6, 2000, notice and order for filing claims was valid.

¶ 35. The OLR's complaint alleged the following counts of misconduct arising out of Attorney Roethe's handling of the two estates:

*Count One.* By having the two co-personal representatives sign a Legal Services Agreement that provided for a fee based on a percentage of the estate's gross value, and by charging a percentage of the estate's value for his representation, Attorney Roethe violated Wis. Stat. § 851.40(2)(e), and supreme court decisions regulating the conduct of lawyers, in violation of former SCR 20:8.4(f).[2]

*Count Two.* By directing his assistant to change the year typed on a deed, to change the name of the deed's drafter, and to insert a day and a month on the deed, after the deed had been signed by the grantors and without the knowledge or permission of one of the grantors, when Attorney Roethe would have violated SCR 20:8.4(c) had he engaged in the conduct himself, Attorney Roethe violated former SCR 20:8.4(a).[3]

*Count Three.* After having received a January 25, 2000, joint letter from one of the grantors/co-personal representatives who had previously signed an undated personal representative's deed and from the grantee

---

[2] Effective July 1, 2007, substantial changes were made to the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys, SCR Chapter 20. *See* S. Ct. Order 04–07, 2007 WI 4, 293 Wis. 2d xv, 726 N.W.2d Ct.R-45 (eff. July 1, 2007); and S. Ct. Order 06–04, 2007 WI 48, 297 Wis. 2d xv, 730 N.W.2d Ct.R.-29 (eff. July 1, 2007). Because the conduct underlying this case arose prior to July 1, 2007, unless otherwise indicated, all references to the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys will be to those in effect prior to July 1, 2007.

Former SCR 20:8.4(f) provided it is professional misconduct for a lawyer to "violate a statute, supreme court rule, supreme court order or supreme court decision regulating the conduct of lawyers; . . . ."

[3] Former SCR 20:8.4(a) provided it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . . ."

named on the deed, stating that the grantee would not accept transfer of the real estate to her until certain events had occurred; by inserting the date of February 11, 2000, on the deed, by inserting February 11, 2000, as the date he authenticated the grantors' signatures, and by recording the deed on February 14, 2000, Attorney Roethe violated former SCR 20:1.2(a)[4] and SCR 20:8.4(c).[5]

Also, by failing to respond to the co-personal representative's January 25, 2000, letter; by failing to inform her that he had dated the personal representative's deed February 11, 2000, and authenticated her signature on that date; by failing to ensure that A.W., as co-personal representative, was informed of his intention to record the personal representative's deed prior to the time it was recorded; and by failing to send A.W. a copy of a March 15, 2000, letter addressed to the other co-personal representative and two heirs, which letter enclosed paperwork to remove A.W. as co-personal representative, Attorney Roethe violated former SCR 20:1.4(a).[6]

*Count Four.* By permitting and ratifying his assistant's conduct in notarizing the signatures of two

---

[4] Former SCR 20:1.2(a) provided, in pertinent part:

A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall inform a client of all offers of settlement and abide by a client's decision whether to accept an offer of settlement of a matter. . . .

[5] Former SCR 20:8.4(c) stated it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[6] Former SCR 20:1.4(a) provided, "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

persons on a sworn affidavit, when those persons did not appear before his assistant on the date she attested the signatures were subscribed and sworn to before her and when the two persons were not even in Wisconsin on that date; and by permitting the notarized affidavit to be filed with a court, when Attorney Roethe would have violated SCR 20:8.4(c) had he engaged in the conduct himself, Attorney Roethe violated former SCR 20:5.3(c).[7]

*Count Five.* By permitting and ratifying his assistant's conduct in notarizing R.W.'s signature on an application for informal administration and on a proof of heirship, when R.W. did not appear before his assistant on the date she attested the signatures were subscribed and sworn to before her, and when R.W. was not even in Wisconsin on that date and Attorney Roethe and his assistant knew R.W. had signed the documents several days before the date of the notarization; and by then permitting the two notarized documents to be filed with a court, when Attorney Roethe would have violated SCR 20:8.4(c) had he engaged in the conduct himself, Attorney Roethe violated former SCR 20:5.3(c).

¶ 36. Attorney Roethe filed an answer and affirmative defenses. On October 2, 2009, the parties entered into a stipulation whereby they agreed that certain matters could be considered by the referee as being established as a matter of fact. A hearing was held

---

[7] Former SCR 20:5.3(c) provided: Responsibilities regarding nonlawyer assistants.

(c) A lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

before the referee on October 19 and 20, 2009. The referee issued his report and recommendation on November 27, 2009. He concluded the OLR failed to meet its burden of proof with respect to the allegations contained in Counts 2 and 3 of the OLR's complaint. He concluded the OLR had met its burden of proof as to the allegations contained in Counts 1, 4, and 5.

¶ 37. As to Count 1, the referee concluded that Attorney Roethe's legal services agreement providing for a fee based upon a percentage of the gross value of the estate was a violation of Wis. Stat. § 851.40(2)(e), which controls billing in probate matters.[8] The referee noted that Attorney Roethe was charged with violating SCR 20:8.4(f), which makes it professional misconduct for an attorney to violate a statute. The referee found that the OLR met its burden of proof on Count 1.

¶ 38. As to Count 2, the referee found that Attorney Roethe directed his assistant to change the year typed on a deed, change the name of the deed's drafter, and insert a month and date on the deed after it was signed by the grantors. The referee found these changes were made with the knowledge and permission of the grantors. Consequently, the referee found that OLR failed to meet its burden of proof as to Count 2.

---

[8] Wisconsin Stat. § 851.40(2)(e) (1999–2000) provided:

(2) Any personal representative, heir, beneficiary under a will or other interested party may petition the court to review any attorney's fee which is subject to sub. (1). If the decedent died intestate or the testator's will contains no provision concerning attorney fees, the court shall consider the following factors in determining what is a just and reasonable attorney's fee:

. . .

(e) The sufficiency of assets properly available to pay for the services, except that the value of the estate may not be the controlling factor.

¶ 39. As to Count 3, the referee also found that OLR failed to meet its burden of proof. The referee concluded that the OLR failed to prove that Attorney Roethe did anything beyond the scope of his representation. The referee said Attorney Roethe was representing the co-personal representative of an estate, and the goal was to distribute the special bequests and do whatever was necessary to close the estate. The referee concluded that any problems in communication were caused by A.W.'s failure to communicate with Attorney Roethe, not the other way around.

¶ 40. With respect to Count 4, the referee noted the parties stipulated that by permitting and ratifying his assistant's conduct in notarizing signatures of two persons on a sworn affidavit, when those two persons did not appear before the assistant on the date she attested the signatures were subscribed and sworn to before her, and when the two persons were not even in Wisconsin on that date, Attorney Roethe violated former SCR 20:5.3(c).

¶ 41. As to Count 5, the referee noted that Attorney Roethe also stipulated that by permitting and ratifying his assistant's conduct in notarizing R.W.'s signature on an application for informal administration and on a proof of heirship, when R.W. did not appear before the assistant on the date she attested his signatures were subscribed and sworn to before her, and then by permitting the notarized documents to be filed with the court, Attorney Roethe violated former SCR 20:5.3(c).

¶ 42. The OLR's complaint sought a 60–day suspension of Attorney Roethe's license. In forming his recommendation for a sanction, the referee noted a

number of aggravating factors, the most serious being that Attorney Roethe received a public reprimand in 2000. The referee also noted that the matter involved two different estates and multiple counts of misconduct.

¶ 43. The referee commented at length about the credibility of the various witnesses who testified at the hearing. The referee found that A.W. "was argumentative and often nonresponsive, especially on cross-examination. ... She attempted to parse words ... when it suited her. She did run on answers. She basically tried to take control of the questioning when she was on the stand." The referee said during her testimony A.W. repeatedly denied the obvious, gave opinions she was not qualified to give, and frequently made overstatements of fact. The referee noted that A.W. waited for six years before filing a grievance with the OLR. When asked about the delay, A.W. said she had spent 700 hours working on the second estate and that she had been injured and laid up for a year and a half or two years. The referee said, "I found her reasons to be entirely unconvincing."

¶ 44. The referee said although A.W. continually denied she had hired Attorney Roethe's firm for the probate, exhibits admitted into evidence clearly indicated that she did in fact hire the law firm for probate. While A.W. denied receiving Attorney Roethe's March 6, 2000, letter, the referee found she did not receive the letter because she deliberately avoided picking it up. The referee summed up A.W.'s testimony by saying, "She basically accuses everybody else, at the best, of being wrong, and at the most of lying. Therefore, unless her testimony was corroborated by some other witness, I gave it absolutely no weight whatsoever."

630

¶ 45. The referee found that Attorney Roethe was an honest witness, and there was nothing to suggest he did anything for personal gain or to injure any of the heirs.

¶ 46. There was a dispute over whether the estate or the co-personal representatives were the client. Attorney Bruce Briney testified there were no reported cases on point giving guidance as to who the client is in a probate matter. However, Attorney Briney testified unequivocally that the client is the estate. In Attorney Briney's opinion, it was reasonable for Attorney Roethe to presume he was representing the estate as a client, and he testified that Attorney Roethe's scope of representation was appropriate. Attorney James Hill expressed the opinion that the co-personal representatives, not the estate, were the clients. The referee ultimately concluded the co-personal representatives were the clients.

¶ 47. The referee based this conclusion, in large part, on the language of the legal services agreement, which unequivocally indicated the clients were the co-personal representatives. Nonetheless, the referee said Attorney Roethe quite clearly and honestly believed the estate was his client and he was doing what he was obligated to do as an attorney for the benefit of the estate. The referee noted that Attorney Roethe has had a long and honorable career and has benefitted his local communities through various civic organizations. The referee also said there was testimony at the hearing that Attorney Roethe was acting as a reasonable attorney would act. The referee also commended the parties for entering into a stipulation as to many of the facts, which shortened the hearing process. The referee concluded by saying:

631

And finally, I would be remiss if I didn't say quite bluntly that Attorney Roethe was afflicted with an insufferable, unreasonable client in this case. We've all had them and his biggest mistake was not getting rid of her quickly rather than allowing her to take up the resources of his firm in such a way that it should have been predictable that nothing the firm did for her was ever going to satisfy her.

¶ 48. Accordingly, the referee recommended that Attorney Roethe be publicly reprimanded and that he be required to pay the full costs of the proceeding.

¶ 49. This court will affirm a referee's findings of fact unless they are clearly erroneous. Conclusions of law are reviewed de novo. *In re Disciplinary Proceedings Against Tully*, 2005 WI 100, ¶ 25, 283 Wis. 2d 124, 699 N.W.2d 882. This court is free to impose whatever discipline it deems appropriate, regardless of the referee's recommendation. *In re Disciplinary Proceedings Against Widule*, 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

██

¶ 50. Because they have not been shown to be clearly erroneous, we adopt the referee's findings of fact. We also agree with the referee's conclusions of law and his recommendation regarding the appropriate level of discipline. We conclude that a public reprimand is sufficient to achieve the objectives of attorney discipline. Finally, we order that Attorney Roethe shall bear the full costs of this proceeding.

¶ 51. IT IS ORDERED that Jeffrey T. Roethe is publicly reprimanded for professional misconduct.

¶ 52. IT IS FURTHER ORDERED that within 60 days of the date of this order, Jeffrey T. Roethe pay to the Office of Lawyer Regulation the costs of this pro-

ceeding. If such costs are not paid within the time specified, and absent a showing to the court of his inability to pay the costs within that time, the license of Jeffrey T. Roethe to practice law in Wisconsin shall be suspended until further order of this court.